**Slip Op. 16- 46**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**MAVERICK TUBE CORPORATION,**

Plaintiff,

**TOSÇELIK PROFIL VE SAC ENDÜSTRISI A.Ş., and ÇAYIROVA BORU SANAYI VE TICARET A.Ş.,**

Consolidated Plaintiffs,

**BOOMERANG TUBE LLC, ENERGEX TUBE (A DIVISION OF JMC STEEL GROUP), TEJAS TUBULAR PRODUCTS, TMK IPSCO, VALLOUREC STAR, L.P., WELDED TUBE USA INC., and UNITED STATES STEEL CORPORATION,**

Plaintiff-Intervenors,

v.

**UNITED STATES,**

Defendant,

**BORUSAN ISTIKBAL TICARET A.Ş., BORUSAN MANNESMANN BORU SANAYI VE TICARET A.Ş., TOSÇELIK PROFIL VE SAC ENDÜSTRISI A.Ş., and ÇAYIROVA BORU SANAYI VE TICARET A.Ş.,**

Defendant-Intervenors.

**Before: Jane A. Restani, Judge**

**Consol. Court No. 14-00244**

**OPINION**

[Commerce's Final Results of Redetermination in antidumping duty investigation sustained.]

Dated: May 10, 2016

Robert E. DeFrancesco, III, Alan H. Price, Adam M. Teslik, and Laura El-Sabaawi, Wiley Rein, LLP, of Washington, DC, for plaintiff.

David L. Simon, Law Office of David L. Simon, of Washington, DC, for consolidated plaintiffs and defendant-intervenors Tosçelik Profil ve Sac Endüstrisi A.Ş. and Çayirova Boru Sanayi Ve Ticaret A.Ş.

Roger B. Schagrin, John W. Bohn, and Paul W. Jameson, Schagrin Associates, of Washington, DC, for plaintiff-intervenors Boomerang Tube LLC, Energex Tube (a Division of JMC Steel Group), Tejas Tubular Products, TMK IPSCO, Vallourec Star, L.P., and Welded Tube USA Inc.

Jon D. Corey, Jonathan G. Cooper, and Susan R. Estrich, Quinn Emanuel Urquhart & Sullivan, LLP, of Washington, DC, for plaintiff-intervenor United States Steel Corporation.

Hardeep K. Josan, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of New York, NY, for defendant. With her on the brief were Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Jeanne E. Davidson, Director, and Claudia Burke, Assistant Director. Of counsel on the brief was Jessica M. Link, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, DC.

Donald B. Cameron, Brady W. Mills, Julie C. Mendoza, Mary S. Hodgins, R. Will Planert, and Sarah S. Sprinkle, Morris, Manning & Martin, LLP, of Washington, DC, for defendant-intervenors Borusan Istikbal Ticaret A.Ş. and Borusan Mannesmann Boru Sanayi ve Ticaret A.Ş.

Restani, Judge: Currently before the court are the U.S. Department of Commerce's ("Commerce") Final Results of Redetermination Pursuant to Ct. Remand, ECF No. 111-1 ("Remand Results"). The Remand Results concern the final determination in the antidumping ("AD") investigation of oil country tubular goods ("OCTG") from the Republic of Turkey ("Turkey"), covering the period of investigation between July 1, 2012, and June 30, 2013. Certain Oil Country Tubular Goods from the Republic of Turkey: Final Determination of Sales at Less Than Fair Value and Affirmative Final Determination of Critical Circumstances, in Part, 79 Fed. Reg. 41,971, 41,971 (Dep't Commerce July 18, 2014) ("Final Determination"). The court remanded Commerce's calculation of the constructed value ("CV") profit margin ("CV Profit") and duty drawback adjustment used in determining the AD duty margin for mandatory

respondent and consolidated plaintiff Çayirova Boru Sanayi ve Ticaret A.Ş. ("Çayirova") and its affiliated exporter Yücel Bora Ithalat-Pazarlama A.Ş. (collectively, "Yücel"). Maverick Tube Corp. v. United States, 107 F. Supp. 3d 1318, 1323, 1335, 1338–42 (CIT 2015) ("Maverick"). Commerce's revised calculations are supported by substantial evidence and accordingly the Remand Results are sustained.

**BACKGROUND**

The court presumes familiarity with the facts of the case as discussed in Maverick, 107 F. Supp. 3d at 1323–26, but the facts relevant to the Remand Results are summarized briefly for convenience.

A dumping margin is "the amount by which the normal value[1] exceeds the export price.[2]" 19 U.S.C. § 1677(35)(A) (2012). Relevant to the calculation on remand, when a respondent, such as Yücel, does not have any home market or third country sales, Commerce calculates normal value using CV. 19 U.S.C. § 1677b(a)(4); see Maverick, 107 F. Supp. 3d at 1336. CV is calculated by applying a statutory formula, which includes the sum of the costs of production ("Selling Expenses") plus an amount for profit (CV Profit), and other incidental expenses. See 19 U.S.C. § 1677b(e); 19 C.F.R. § 351.405(b) (2013). In calculating normal

---

[1] The normal value of the subject merchandise is defined as "the price at which the foreign like product is first sold . . . for consumption in the exporting country, in the usual commercial quantities and in the ordinary course of trade and, to the extent practicable, at the same level of trade as the export price or constructed export price." 19 U.S.C. § 1677b(a)(1)(B)(i) (2012). Here, normal value is the price at which OCTG products are sold in Turkey.

[2] Export price is "the price at which the subject merchandise is first sold . . . before the date of importation by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States." 19 U.S.C. § 1677a(a).

value using CV, Commerce's preferred method is to include "the actual amounts incurred and realized by the specific exporter or producer being examined . . . for selling, general, and administrative expenses, and for profits, in connection with the production and sale of a foreign like product, in the ordinary course of trade, for consumption in the foreign country." 19 U.S.C. § 1677b(e)(2)(A). If such data are unavailable, Commerce resorts to one of three statutory alternatives for calculating Selling Expenses and CV Profit.[3] 19 U.S.C. § 1677b(e)(2)(B). The court will refer to these alternatives as "alternative (i)," "alternative (ii)," and "alternative (iii)," respectively. Also relevant to the calculation on remand, in calculating export price, Commerce increases export price by "the amount of any import duties imposed by the country of

---

[3] The three statutory alternatives are:

> (i) the actual amounts incurred and realized by the specific exporter or producer being examined in the investigation or review for selling, general, and administrative expenses, and for profits, in connection with the production and sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise,
> (ii) the weighted average of the actual amounts incurred and realized by exporters or producers that are subject to the investigation or review (other than the exporter or producer described in clause (i)) for selling, general, and administrative expenses, and for profits, in connection with the production and sale of a foreign like product, in the ordinary course of trade, for consumption in the foreign country, or
> (iii) the amounts incurred and realized for selling, general, and administrative expenses, and for profits, based on any other reasonable method, except that the amount allowed for profit may not exceed the amount normally realized by exporters or producers (other than the exporter or producer described in clause (i)) in connection with the sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise [i.e., what is commonly referred to as the "profit cap."]

19 U.S.C. § 1677b(e)(2)(B). The statute "does not establish a hierarchy or preference among these alternative methods." Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1, at 840 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4176.

exportation which have been rebated, or which have not been collected, by reason of the exportation of the subject merchandise to the United States[;]" this is commonly referred to as the duty drawback adjustment. 19 U.S.C. § 1677a(c)(1)(B).

On February 25, 2014, Commerce assigned Yücel a preliminary dumping margin of 4.87 percent.[4] Certain Oil Country Tubular Goods From the Republic of Turkey: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Negative Preliminary Determination of Critical Circumstances, and Postponement of Final Determination, 79 Fed. Reg. 10,484, 10,486 (Dep't Commerce Feb. 25, 2014) ("Preliminary Determination"). In the Preliminary Determination, Commerce determined, with respect to Yücel, the data to calculate CV Profit under § 1677b(e)(2)(A) were unavailable, and therefore, that it was necessary to rely on one of the alternatives listed in § 1677b(e)(2)(B). Decision Memorandum for the Preliminary Affirmative Determination in the Antidumping Duty Investigation of Certain Oil Country Tubular Good from the Republic of the Turkey at 25, A-489-816, (Feb. 14, 2014), available at http://enforcement.trade.gov/frn/summary/turkey/2014-04108-1.pdf (last visited Apr. 27, 2016) ("Preliminary I&D Memo"). Commerce preliminarily calculated Yücel's CV Profit based on its home market sales of non-OCTG pipe products pursuant to alternative (i). See id.; see also 19 U.S.C. § 1677b(e)(2)(B)(i). Commerce also preliminarily granted Yücel a duty drawback adjustment, but stated it would further consider the adjustment. Preliminary I&D Memo at 20.

[4] Commerce calculated a preliminary margin of zero percent for the other mandatory respondent, Borusan Manesmann Boru Sanayi ve Ticaret A.Ş. and Borusan Istikbal Ticaret A.Ş. (collectively, "Borusan"). See Certain Oil Country Tubular Goods From the Republic of Turkey: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Negative Preliminary Determination of Critical Circumstances, and Postponement of Final Determination, 79 Fed. Reg. 10,484, 10,486 (Dep't Commerce Feb. 25, 2014) ("Preliminary Determination").

In Commerce's Final Determination, issued on July 18, 2014, Yücel's margin increased dramatically to 35.86 percent. 79 Fed. Reg. at 41,973. Yücel's margin increased for two reasons. First, Commerce calculated CV Profit using alternative (iii) based on data from the 2012 financial statements of Tenaris S.A. ("Tenaris"), a multinational OCTG company whose data Commerce sua sponte placed on the record on May 12, 2014.[5] See Issues and Decision Memorandum for the Final Affirmative Determination in the Less than Fair Value Investigation of Certain Oil Country Tubular Goods from the Republic of Turkey at 2, 20–27, A-489-816, (July 10, 2014), available at http://enforcement.trade.gov/frn/summary/turkey/2014-16873-1.pdf (last visited Apr. 27, 2016) ("I&D Memo"). Commerce also did not apply a profit cap as required by alternative (iii) because it did not have "home market data for other exporters and producers in Turkey of the same general category of products." Id. at 26. Second, Commerce denied approximately two-thirds of Yücel's duty drawback adjustment because the Harmonized Tariff Schedule ("HTS") headings under which the subject merchandise were reported to Turkish customs appeared to be non-OCTG headings in the United States. Id. at 15–16.

Çayirova challenged the Final Determination, arguing that Commerce improperly calculated CV Profit using the Tenaris data and should have awarded the full amount of the

[5] Commerce rejected applying alternative (i) because Commerce determined that Yücel's non-OCTG pipe products did not fall within the "same general category of products" as the subject merchandise. Issues and Decision Memorandum for the Final Affirmative Determination in the Less than Fair Value Investigation of Certain Oil Country Tubular Goods from the Republic of Turkey at 22–24, A-489-816, (July 10, 2014), available at http://enforcement.trade.gov/frn/summary/turkey/2014-16873-1.pdf (last visited Apr. 26, 2016) ("I&D Memo"). Commerce rejected alternative (ii) based on concerns with using the business proprietary information ("BPI") of the only other mandatory respondent, Borusan. Id. at 21–22.

requested duty drawback adjustment.[6] See Maverick, 107 F. Supp. 3d at 1325. The government defended Commerce's CV Profit calculation, but requested a remand to allow it an opportunity to "'reconsider its [duty drawback] determination' because it 'changed certain aspects of its duty drawback decision between the preliminary and final determinations and did not have the opportunity to consider the impact of those changes or certain arguments [that were] raised before the Court.'" Id. at 1333 (quoting Def.'s Resp. in Opp'n to Mots. for J. upon the Administrative R. 54, ECF No. 60).

In Maverick, the court remanded two issues to Commerce: (1) the calculation of CV Profit used in Yücel's dumping margin analysis; and (2) Yücel's duty drawback adjustment.[7] See id. at 1342. The court held that Commerce's use of Tenaris's financial statements for the calculation of Yücel's CV Profit was unsupported by substantial evidence because it did not accurately reflect the home market experience. Id. at 1338–39. The court further held that Commerce did not adequately explain why it dispensed with alternative (iii)'s profit cap requirement. Id. at 1339. For these reasons, the court directed Commerce to explain why a CV Profit based on a range derived from the confidential profit margin of the other mandatory

---

[6] Maverick Tube Corporation ("Maverick") and United States Steel Corporation ("U.S. Steel") (collectively "petitioners") challenged the Final Determination on five grounds, arguing that Commerce: (1) did not support its normal value calculation for Borusan with substantial evidence based on fictitious market allegations; (2) improperly granted Borusan and Yücel duty drawback adjustments; (3) conflated standard J55 OCTG with upgradeable J55 OCTG for dumping margin calculation purposes; (4) failed to acknowledge Borusan's potential undisclosed affiliation; and (5) improperly included Borusan export price sales in its U.S. sales database. Maverick, 107 F. Supp. 3d at 1324 & n.5 (citing Pl. Maverick Tube Corp.'s Mem. in Supp. of its Rule 56.2 Mot. for J. on the Agency R. 10–46, ECF No. 49; Mot. of Pl. United States Steel Corp. for J. on the Agency R. Under Rule 56.2, ECF No. 46 (adopting Maverick's arguments)).

[7] The court sustained Commerce's determinations on petitioner's other challenges. See supra note 5; Maverick, 107 F. Supp. 3d at 1327–28, 1330, 1332, 1333.

respondent, Borusan Istikbal Ticaret A.Ş. and Borusan Mannesmann Boru Sanayi ve Ticaret A.Ş. (collectively "Borusan"), could not be used in accordance with alternative (ii), beyond the vaguely referenced concerns surrounding the use of business proprietary information ("BPI"). Id. at 1340. The court also instructed Commerce to explain its determination that alternative (i) could not be applied because Çayirova's non-OCTG products are not in the "same general category of products" as OCTG. Id. With respect to Yücel's duty drawback adjustment, the court held that changes made between the preliminary and final determinations warranted a remand. Id. at 1333.

On October 6, 2015, the government moved for clarification as to the scope of the remand order, asking whether the court granted Commerce's request for a remand "to reconsider the remaining duty drawback issues with respect to Yücel[.]" Def.'s Resp. to the Court's Sept. 24, 2015 Op. and Order and Mot. for Clarification 4, ECF No. 94. In response, the court made clear in an order on October 8, 2015, that it would "allow Commerce the opportunity to decide the drawback issue as to Yücel according to its normal established methodologies based on the particular facts that apply to Yücel." Order 2, ECF No. 96 ("Clarification Order").

On remand, Commerce revised Yücel's CV Profit calculation using alternative (ii) based on Borusan's home market sales data. Remand Results at 8; see 19 U.S.C. § 1677b(e)(2)(B)(ii). Commerce determined that by combining Borusan's Selling Expenses and CV Profit rates into a single aggregate rate, it could use Borusan's data without risking the disclosure of BPI. Remand Results at 7. Commerce determined that by combining Selling Expenses and CV Profit, it is protecting Borusan's BPI by making it impossible for Yücel to discern which portion of the

aggregate figure is attributable to either Selling Expenses or CV Profit.[8] Id. at 8. Using this method, Yücel's revised combined CV Profit and Selling Expenses rate is 7.38 percent. Analysis Memorandum for Final Results of Redetermination for Yücel at 2, bar code 3437896-01 (Feb. 1, 2016) ("Yücel Final Analysis Memo").

With regard to Yücel's duty drawback adjustment, Commerce reconsidered the record evidence and determined that Yücel was not entitled to an adjustment. Remand Results at 26. It determined that an adjustment is only available in situations where, "a foreign country would normally impose an import duty on an input used to manufacture the subject merchandise, but offers a rebate from the duty if the input is exported to the United States[.]" Id. at 25 (quoting Saha Thai Steel Pipe (Public) Co. v. United States, 635 F.3d 1335, 1338 (Fed. Cir. 2011)). Commerce determined that Yücel was not entitled to an adjustment because the inputs on which Yücel received a duty exemption were not suitable for, "and therefore could not have been used in its production of, subject merchandise which was exported to the United States."[9] Id. These

---

[8] Although the issue likely was mooted by its decision to calculate CV Profit using alternative (ii), Commerce complied with the court's instructions and further explained its rejection of alternative (i). Commerce clarified that differences in market conditions between the oil and gas and construction industries were not in and of themselves reasons that products would not be in the same general category, but were relevant to the analysis of whether the products were sold and used in the same industry. Remand Results at 10. Commerce also explained that testing requirements and quality standards for OCTG indicated that they were used in "down-hole" applications, which was relevant for analyzing the products' uses and characteristics. Id. at 10–11. Commerce declined to reexamine its reasoning for dispensing with the profit cap requirement under alternative (iii) because that issue was mooted by its decision to calculate CV Profit pursuant to alternative (ii). Id. at 13.

[9] "According to Yücel, the only hot-rolled steel coils that were suitable for consumption in the production of its OCTG exported to the United States were purchased from domestic sources." Id. at 25.

partially offsetting changes ultimately reduced Yücel's dumping margin to 13.59 percent. Id. at 40.

Both Maverick Tube Corporation ("Maverick") and United States Steel Corporation ("U.S. Steel") (collectively "petitioners") contest the use of Borusan's BPI in calculating Yücel's combined Selling Expenses and CV Profit rate.[10] They argue that relying on an aggregate figure of Borusan's proprietary information has the potential of disclosing Borusan's BPI, as Yücel can access its own BPI information and simply "back its information out from Borusan's[.]" Maverick Tube Corp.'s Cmts. on the U.S. Dep't of Commerce's Feb. 2, 2016 Final Results of Redetermination Pursuant to Ct. Remand 4, ECF No. 117 ("Maverick Cmts."); U.S. Steel Corp.'s Cmts. on the U.S. Dep't of Commerce's Final Results of Redetermination Pursuant to Ct. Remand 8, ECF No. 115 ("U.S. Steel Cmts."). They assert that Commerce must revert to using Tenaris's financial statements under alternative (iii), because using an aggregate figure erodes the prior practice of Commerce and the court in assuring adequate protection of BPI.[11] Maverick Cmts. at 4–5, 13–15 ("It also amounts to a substantial change in practice without notice and comment period."); U.S. Steel Cmts. at 3, 10 ("[W]hen data is available from only

[10] Borusan has not objected to the manner in which Commerce used its BPI.

[11] Maverick and U.S. Steel further argue that the use of Borusan's home market sales in the calculation of Selling Expenses and CV Profit is improper because Borusan's home market sales are mainly "overruns," are not used in oil or gas exploration, and were made under unusually customer-friendly terms. Maverick Cmts. at 7–13; U.S. Steel Cmts. at 10. This is an attempt to restate their previous objection to the use of Borusan's home market sales based on allegations that they are outside the ordinary course of trade and are part of a fictitious market. See Maverick Cmts. at 7–15; U.S. Steel Cmts. at 10. Those arguments were previously considered and rejected in Maverick, 107 F. Supp. 3d at 1328–29, 1330–31, 1332–33, and the court adheres to its prior holding that Commerce's determination that the sales are legitimate is supported by substantial evidence.

one other respondent, Commerce's longstanding and oft-followed practice is to reject [alternative (ii)] to avoid the risk of disclosing that respondent's proprietary information.").[12]

Çayirova argues Commerce properly calculated CV Profit, but challenges Commerce's duty drawback determination. See Objs. of Pl. Çayirova Boru Sanayi ve Ticaret A.Ş. to Dep't of Commerce Redetermination on Remand 1, ECF. No. 113 ("Çayirova's Cmts."). Çayirova argues that Commerce adopted an unprecedented threshold inquiry in its duty drawback analysis requiring that inputs for which a company claims duty drawback must be suitable for or used in the production of the subject merchandise. Çayirova Cmts. at 5–11. Çayirova further argues that this "suitability-for-use" test is a new legal standard that was improper so late in the litigation and was not applied equally to both respondents in this case, as Yücel was the only party subject to remand on the duty drawback issue. See id. at 11–15.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c). The court will uphold Commerce's redetermination in an AD investigation unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

### I. Constructed Value Profit Margin

Commerce has an obligation to protect BPI that is disclosed in the course of AD investigations. See 19 U.S.C. § 1677f(b)(1)(A). Although Commerce has previously avoided

[12] Maverick also argues Commerce properly denied Yücel's duty drawback adjustment. Maverick Cmts. at 2–4.

the application of alternative (ii) to calculate a respondent's CV Profit in cases where there is only one other respondent, see, e.g., Atar S.r.L. v. United States, 730 F.3d 1320, 1327 (Fed. Cir. 2013), in this case, Commerce has refined its methodology to prevent the disclosure of BPI. By combining the confidentially calculated individual Selling Expense and CV Profit rates derived from Borusan's BPI into an aggregate total, Commerce has adequately concealed Borusan's BPI. See Yücel Final Analysis Memo at 2; see also Remand Results at 17–18; 19 U.S.C. § 1677f(b)(1)(A). After considering the risk of disclosing BPI, Commerce fashioned a method of protecting Borusan's data, which when combined with the Administrative Protective Order ("APO") already in place in this case, sufficiently protects Borusan's BPI by identifying only the aggregate figure in all relevant documentation. See Remand Results at 17, 18 & n.44; see also Yücel Final Analysis Memo at 2; cf. SNR Roulements v. United States, 13 CIT 1, 6, 704 F. Supp. 1103, 1108 (1989). This method of relying on BPI data without disclosing such data mitigates Commerce's prior concern with using alternative (ii) in situations where there is only one other respondent. In the light of the particular facts of this case, the court holds that Commerce's calculation of Yücel's AD duty margin based on the aggregate Selling Expenses and CV Profit rate is supported by substantial evidence.

Petitioners' do not challenge Commerce's actual calculation under alternative (ii), rather they challenge only Commerce's selection of alternative (ii). They argue that the Remand Results represent an abandonment of Commerce's longstanding practice of avoiding alternative (ii) to calculate Selling Expenses or CV Profit in cases where there is only one respondent with available home market data. See Maverick Cmts. at 4–5; see also U.S. Steel Cmts. at 3–8. U.S. Steel, in particular, cites to three cases where the court approved this prior practice based on

concerns about the disclosure of BPI. See U.S. Steel Cmts. at 5–8 (citing Atar, 730 F.3d at 1327; Geum Poong Corp. v. United States, 28 CIT 1089, 1091–92, 163 F. Supp. 2d 669, 674 (2001); Thai Plastic Bags Indus. Co v. United States, 904 F. Supp. 2d 1326, 1335 (CIT 2011)). U.S. Steel also contends that Commerce specifically rejected the aggregation method used in this case in a prior decision. . Id. at. 8 (citing Notice of Final Determination of Sales at Less Than Fair Value: Polyethylene Retail Carrier Bags from Thailand, 69 Fed. Reg. 34,122 (Dep't of Commerce June 18, 2004) ("Carrier Bags from Thailand")). These arguments are unpersuasive.

Commerce is allowed "flexibility to change its position provid[ed] that it explains the basis for the change and provid[ed] that the explanation is in accordance with law and supported by substantial evidence." Cultivos Miramonte, S.A. v. United States, 21 CIT 1059, 1064, 980 F. Supp. 1268, 1274 (1997) (footnotes omitted); accord Nippon Steel Corp. v. U.S. Int'l Trade Comm'n, 494 F.3d 1371, 1377 n.5 (Fed. Cir. 2007); see also Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins., 463 U.S. 29, 57 (1983) (holding that an agency must give a reasoned analysis for a change from prior practice). For Commerce's explanation to be satisfactory, it must state "why it is changing course, not merely that it is changing course." See Huvis Corp. v. United States, 31 CIT 1803, 1813, 525 F. Supp. 2d 1370, 1380 (2007) (citing Nippon Steel Corp., 494 F.3d at 1377 n.5). Here, Commerce adequately explained its revised calculation based on a methodology that mitigated prior concerns of disclosing BPI underling its prior decisions not to use alternative (ii) in situations where there were only two respondents.

In the Remand Results, Commerce properly distinguished the methodology used to calculate Selling Expenses and CV Profit in its prior decisions from the aggregation method used in this case. See Remand Results at 16. Furthermore, Commerce adequately explained that its

prior decisions did not preclude it from utilizing a respondent's BPI pursuant to alternative (ii) in all cases where there is only one respondent with viable home market data. See id.; Cf. Issues and Decision Memorandum for the Final Determination of the Antidumping Duty Investigation of Polyethylene Retail Carrier Bags from Thailand at 23, A-549-821 (June 18, 2004), available at http://enforcement.trade.gov/frn/summary/thailand/04-13814-1.pdf (last visited Apr. 27, 2016) ("Carrier Bags from Thailand I&D Memo") ("Even if the [Commerce] has not used ranged public data to calculate CV selling expenses and profit in the past . . . this does not preclude [Commerce] from using this type of data now."). Commerce sufficiently supported its reasoning by relying on its prior decision in Certain Steel Nails from the Republic of Korea: Final Determination of Sales at Less Than Fair Value, 80 Fed. Reg. 28,955 (Dep't Commerce May 20, 2015) ("Steel Nails from Korea"), which stated that using one of two respondents' BPI under alternative (ii) most closely simulates the statutorily preferred method for calculating Selling Expenses or CV Profit.[13] See Remand Results at 15–16; see also Certain Steel Nails from the Republic of Korea: Issues and Decision Memorandum for the Final Determination of Sales at Less Than Fair Value at 13–14, A-580-874 (May 13, 2015), available at http://enforcement.trade.gov/frn/summary/korea-south/2015-12257-1.pdf (last visited Apr. 27, 2016).

[13] Although, as U.S. Steel argues, the facts of Steel Nails from Korea are not the same as those presented here, Commerce's reliance on that decision is still proper for the underlying proposition that the use of Borusan's BPI under alternative (ii), even in cases where there is only one respondent with viable home market data, best reflects the "actual experience of a company subject to the investigation as it pertains to the production and sale of OCTG in Turkey." See U.S. Steel Cmts. at 9–10; Remand Results at 15–16.

Contrary to petitioners' arguments, Commerce's use of alternative (ii) is also supported by its determination in Carrier Bags from Thailand. There, Commerce preliminarily used alternative (iii) to calculate CV profit and Selling Expenses for one of two respondents by using the financial statements of a non-respondent Thai company and dispensing with the profit cap requirement. See Carrier Bags from Thailand I&D Memo at 21–23. In its final determination, Commerce again rejected alternative (ii) in favor of alternative (iii), but revised its calculation using the ranged public data, derived from BPI, of the only other respondent, determining that it was the best information available on the record. Id. Similar to Commerce's decision in Carrier Bags from Thailand, here, Commerce used the BPI of the sole other respondent in this case, Borusan, and rather than simply ranging the data, Commerce obscured the BPI by aggregating Selling Expenses and CV Profit into a single figure. This methodology added a layer of protection, rendering it impossible for Yücel to ascertain which fraction of the figure was attributable to either Selling Expenses or CV Profit. See Remand Results at 17–18.

Petitioners argue that it is mathematically possible for Yücel to "back out" its own BPI to reveal Borusan's BPI, yet, they have not demonstrated how in fact such a calculation is possible with the information available in this case. See Maverick Cmts. at 4; U.S. Steel Cmts. at 8. Given the numerous combinations of Selling Expenses and CV Profit rates capable of producing the combined 7.38 percent, Commerce's conclusion that Borusan's BPI is sufficiently protected is supported by substantial evidence. Finally, Borusan has not challenged Commerce's use of its data, further supporting Commerce's determination that its methodology adequately protects BPI. In sum, Commerce often has difficult choices to make in calculating profit, particularly where it finds a respondent's own data flawed and data from non-subject countries is also

problematic. Here, petitioners' BPI concerns are unpersuasive and they also have not challenged the actual calculation under alternative (ii). Accordingly, the court finds Commerce's revised calculation to be supported by substantial evidence and in accordance with law.

**II. Duty Drawback**

In evaluating whether a respondent is entitled to a duty drawback adjustment, Commerce typically employs a two-part test under which the respondent is required to demonstrate:

> (1) that the rebate and import duties are dependent upon one another, or in the context of an exemption from import duties, that the exemption is linked to the exportation of the subject merchandise, and (2) that there are sufficient imports of the raw material to account for the duty drawback on the exports of the subject merchandise.

Saha Thai Steel Pipe, 635 F.3d at 1340 (quoting Saha Thai Steel Pipe Co. v. United States, 33 CIT 1541, 1542 (2009)); see also Allied Tube & Conduit Corp. v. United States, 29 CIT 502, 506, 374 F. Supp. 2d 1257, 1261 (2005). On remand, however, Commerce did not reach the two-part test, but rather, determined based on the unique factual scenario where Yücel admitted that none of the inputs for which duties were exempted were used, or capable of being used, in the production of subject merchandise (i.e., OCTG), that Yücel was not entitled to a duty drawback adjustment.[14] Remand Results at 25–28; see also Çayirova Sec. D Quest. Resp. at 22,

---

[14] The Turkish drawback system does not require parties to directly link an input exempted from duty to the export of subject merchandise "so long as the inputs that are used in the production of exports fall within the same [eight]-digit HTS classification as the inputs for which the company claimed the exemption." Remand Results at 26. Commerce has previously determined that the Turkish drawback system can satisfy the requirements of its duty drawback test, and limited its present determination to the specific facts as related to Yücel. Id. ("We note that this is not a pronouncement on the Turkish duty drawback system as a whole . . .[r]ather, this determination is limited to these unique facts—i.e., that Yücel's inputs at issue are not capable of being used in the production of subject merchandise—which has rarely been faced by [Commerce] in prior (continued…)

PD 105 (Nov. 25, 2013) ("All J55 coil, which is the direct material for OCTG, was purchased from domestic sources."); Çayirova Sec. D Suppl. Quest. Resp. at 21–22, barcode 3174811-01 (Jan. 21, 2014). In support of its determination, Commerce relied on the U. S. Court of Appeals for the Federal Circuit's decision in Saha Thai Steel, 635 F.3d at 1338, which states "if a foreign country would normally impose an import duty on an input used to manufacture the subject merchandise, but offers a rebate or exemption from the duty if the input is exported to the United States, then Commerce will increase [export price] to account for the rebated or unpaid import duty." (emphasis added). See Remand Results at 25, 26. Commerce also based its determination on the fact that the AD statute "generally provides a mechanism to examine prices and costs associated with subject merchandise (or foreign like product)." Id. at 25–26 & nn.67–68 (citing Tariff Act of 1930, 19 U.S.C. §§ 1677a(a), (c), 1677b(a), (2); 19 C.F.R. § 351.401).

Çayirova contends that Commerce improperly denied Yücel a duty drawback adjustment by adding an unwarranted additional hurdle to the analysis. Çayirova Cmts. at 3, 6–11. Çayirova argues that Commerce attempted to impose a similar "suitability" requirement for duty drawback adjustments in Far East Machinery Co. v. United States, 12 CIT 428, 688 F. Supp. 610 (1988) ("FEMCO I"), which the court rejected, and asks the court to do so again. Id. at 3–11. Çayirova also argues that Commerce's new "threshold test" is inconsistent with its longstanding, court-approved, two-part test. Id. at 3–11. Çayirova also argues that the court has rejected previous attempts to add additional substantive hurdles to the drawback analysis not required by the statute. Id. at 6 (citing Chang Tieh Indus. Co. v. United States, 17 CIT 1314, 1320, 840 F.

---

antidumping proceedings involving Turkey, and, indeed, were not facts raised by the situation of the other respondent, Borusan, for whom [Commerce] granted a duty drawback adjustment." (footnote omitted)).

Supp. 141, 147 (1993); Allied Tube, 29 CIT at 507, 374 F. Supp. 2d at 1262). Çayirova also argues that Commerce's reliance on Saha Thai Steel Pipe is misplaced. Id. at 9–11. Finally, Çayirova argues the new "threshold test" constitutes an impermissible change in the legal theory in the midst of litigation, which caused Yücel to be treated differently from the other respondent, Borusan.[15] Id. at 3, 11–15.

Under 19 U.S.C. § 1677a(c)(1), "the price used to establish export price and constructed export price shall be—increased by . . . (B) the amount of any import duties imposed by the country of exportation which have been rebated, or which have not been collected, by reason of the exportation of the subject merchandise to the United States." (emphasis added). Although the court has determined that this provision is unambiguous in certain respects,[16] the court has yet to address the specific question before the court, namely, whether inputs exempted from duty

---

[15] In its comments on the draft remand results before Commerce, Çayirova also argued that Commerce's complete reconsideration of Yücel's duty drawback adjustment exceeded the scope of the remand opinion and order. See Remand Results at 28–29. Çayirova has not raised specifically such argument before the court and accordingly has waived the argument. See Novosteel SA v. United States, 284 F.3d 1261, 1273–74 (Fed. Cir. 2002). Çayirova's argument that Commerce changed legal theories late in the litigation is distinct from, and does not encompass, a challenge to the scope of the remand order, which the court expressly indicated Çayirova was permitted to bring in challenging the Remand Results. Clarification Order at 2.

[16] In Allied Tube, the court stated, "[t]he Court finds that the statute is clear on its face." 29 CIT at 510, 374 F. Supp. 2d at 1264. There, however, the parties challenging the duty drawback adjustment sought to introduce a requirement that the party requesting the adjustment show that the duty exempted by reason of the exportation of subject merchandise was actually imposed on inputs for sales in the home market. Id. at 507, 374 F. Supp. 2d at 1261–62. The statute says nothing about home market sales and the court concluded that "the clear language of 19 U.S.C. § 1677a(c)(1)(B) does not require an inquiry into whether the price for products sold in the home market includes duties paid for imported inputs." Id. at 507, 374 F. Supp. 2d at 1262. The court reached the same conclusion in Chang Tieh, 17 CIT at 1320, 840 F. Supp. at 147, and Wheatland Tube Co. v. United States, 30 CIT 42, 62, 414 F. Supp. 2d 1271, 1288 (2006), rev'd on other grounds 495 F.3d 1355 (Fed. Cir. 2007). As these cases did not concern whether the exempted duties were for inputs incapable of being used to produce subject merchandise, they are clearly distinguishable and Çayrova's reliance on them is misplaced.

under a drawback regime, which could not have been used in the production of subject merchandise, are eligible for a duty drawback adjustment.[17] Nothing in the plain language of the statute addresses whether rebated or exempted duties must be on inputs capable of being used in the production of subject merchandise, however, the statute's purpose and context, as well as precedent, support Commerce's denial of Yücel's duty drawback adjustment.

Although the text does not specifically require that the duty exempted inputs must be of a type capable of use in the production of subject merchandise, the duty drawback adjustment and AD statute generally are concerned with valuing the costs of producing the subject merchandise. See, e.g., 19 U.S.C. § 1677(35)(A) (describing "dumping margin" as the difference between normal value and export price "of the subject merchandise"); § 1677a(a) (defining export price as "the price at which the subject merchandise is first sold"); § 1677b ("In determining under this subtitle whether subject merchandise is being, or is likely to be, sold at less than fair value, a fair

[17] Çayirova incorrectly argues that the court addressed and rejected an "appropriateness" test for duty drawback adjustments in FEMCO I. Çayirova Cmts. at 6–8. In FEMCO I, the court remanded Commerce's denial of a duty drawback adjustment when it imposed an additional hurdle to the two-part test that the imported raw materials "must have been appropriate for incorporation into the exported subject merchandise," while rejecting data that might have satisfied the requirement. 12 CIT at 432, 688 F. Supp. at 612. The court explained that the ITA adopted the two-part test, specifically the second prong and substitution principles, "to relieve it of the difficult, if not impossible, task of determining whether the raw materials used in producing the exported merchandise actually came from imported or domestic sources." Id. at 431, 688 F. Supp. at 612. Here, the task is not difficult, let alone impossible, as Yücel expressly stated that the raw materials used in producing the exported merchandise came from domestic sources. Çayirova Sec. D Quest. Resp. at 22; Çayirova Suppl. Sec. D Quest. Resp. at 21, 22.

Additionally, after a remand, the court sustained Commerce's determination that the respondent had in fact imported a sufficient quantity of coil of the correct specification during the relevant period to make the exported pipe. Far East Mach. Co. v. United States, 12 CIT 972, 975, 699 F. Supp. 309, 312 (1988). Thus, the court never had to evaluate whether the "appropriateness" test was proper.

comparison shall be made between the export price or constructed export price and normal value.") (emphases added). Commerce's regulations also describe the concern with valuing costs associated with subject merchandise. See 19 C.F.R. § 351.401(c) (describing price adjustments as those "reasonably attributable to the subject merchandise" (emphasis added)). The duty drawback adjustment was also intended to enable Commerce to make "a fair comparison" between export price and normal value. See Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1, at 820 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4161–63; 140 Cong. Rec. E2386-01 (1994) ("It is expected that Commerce will ensure that a fair, apples-to-apples comparison is made in all cases."); cf. Florida Citrus Mut. v. United States, 550 F.3d 1105, 1111 (Fed. Cir. 2008) ("[T]he purpose of adjusting U.S. price . . . is to enable a fair 'apples-to-apples' comparison between foreign and domestic price."). Commerce's use here of costs associated with subject merchandise is consistent with this statutory purpose and context.

Contrary to Çayirova's contention, Commerce's determination here does not conflict with precedent and in fact finds support therein. The cases discussing duty drawback adjustments have consistently referred to the adjustment as being for inputs on which duties were exempted that were used in the production of subject merchandise. See, e.g., Saha Thai Steel, 635 F.3d at 1338 ("In other words, if a foreign country would normally impose an import duty on an input used to manufacture the subject merchandise, but offers a rebate or exemption from the duty if the input is exported to the United States, then Commerce will increase [export price]

to account for the rebated or unpaid import duty.");[18] Wheatland Tube Co. v. United States, 30 CIT 42, 60, 414 F. Supp. 2d 1271, 1286 (2006), rev'd on other grounds 495 F.3d 1355 (Fed. Cir. 2007) ("In addition, the first prong enables Commerce to verify that the home country allows rebates or exemptions only for those imported inputs used to produce exported merchandise." (second emphasis added)); Hornos Electricos de Venez. v. United States, 27 CIT 1522, 1525, 285 F. Supp. 2d 1353, 1358 (2003) ("The purpose of a duty drawback adjustment is to prevent dumping margins from arising because the exporting country rebates import duties and taxes for raw materials used in exported merchandise." (emphasis added)); Allied Tube, 29 CIT at 506, 374 F. Supp. 2d at 1261 ("[The] duty drawback adjustment is meant to prevent dumping margins that arise because the exporting country rebates import duties and taxes that it had imposed on raw materials used to produce merchandise that is subsequently exported." (emphasis added)). Additionally, in at least two cases, the court stated that the imports exempted from duties in those cases were in fact used to produce the subject merchandise. Allied Tube, 29 CIT at 509, 374 F. Supp. 2d at 1263; Chang Tieh, 17 CIT at 1320, 840 F. Supp. at 147.

Thus, to comply with the statutory mandate to calculate the most accurate dumping margins possible, Commerce properly denied Yücel's duty drawback adjustment as the duty exemptions claimed were not related to costs incurred in producing subject merchandise. See Rhone Poulenc, Inc. v. United States, 899 F.2d 1185, 1191 (Fed. Cir. 1990). Under Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842–43 (1984),

---

[18] Çayirova argues that Saha Thai Steel is inapposite because the issue was distinct and the language quoted is dicta. Although the issues are different, Saha Thai Steel refers to the duty drawback adjustment as for inputs used to manufacture subject merchandise and thus further supports the reasonableness of Commerce's interpretation in this case.

Commerce's interpretation of the statute as requiring the exempted inputs to be capable of being used in the production of subject merchandise is thus reasonable and a permissible construction of the statute, which does not speak to the precise question at issue.[19]

Finally, Çayirova's argument that Commerce has improperly changed legal theories on remand is unpersuasive. Commerce complied with the court's remand order to determine Yücel's duty drawback using its normal methodology as applied to the particular facts pertaining to Yücel and thus did not impermissibly change legal theories. The case cited by Çayirova do not suggest a different result. See Oy v. United States, 23 CIT 257, 262 (1999) (rejecting a new methodology introduced "after a court-ordered remand to apply the methodology professed by the agency before remand"); Royal Thai Government v. United States, 18 CIT 277, 286, 850 F. Supp. 44, 51 (1994) (refusing to "entertain Commerce's new rationale" after a remand which was "to be limited to the evidence and analysis underlying the agency's [prior] decision"). Here, although the remand order did not permit Commerce to determine that Turkey's system as a whole was lacking, the remand did permit Commerce to consider arguments raised by petitioners. It was clear from the court's Clarification Order that Commerce was permitted to evaluate whether Yücel's imports were suitable for use in producing subject merchandise, and Çayirova also has failed to challenge the scope of the remand order.[20]

---

[19] This matter does not call upon the court to decide whether Commerce generally should inquire, as to foreign substitution drawback systems which permit drawback for imports which may not necessarily be suitable for production of the exported merchandise, whether the imports are in fact suitable. The court decides only that where it has become apparent that the imports are not suitable that Commerce reasonably administers the statute in rejecting the drawback adjustment.

[20] Çayirova's additional argument that the Remand Results treat it differently from Borusan is

(continued…)

**CONCLUSION**

For the foregoing reasons, the Remand Results are sustained and judgment will issue accordingly.

/s/ Jane A. Restani
Jane A. Restani
Judge

Dated: May 10, 2016
New York, New York

---

also unpersuasive. Borusan's duty drawback adjustment was not subject to the court's remand and unlike Yücel, Borusan did not state that it sourced its OCTG raw materials from only domestic sources or had only imports unsuitable for OCTG production. Thus, the court's holding that Commerce's determination that Borusan's duty drawback adjustment, based on the fact that it imported sufficient quantities of coil capable of being used to produce OCTG to account for its exports, was supported by substantial evidence stands. Maverick, 107 F. Supp. 3d at 1334–35.